Our next case for argument this morning is United States v. Correa. Mr. Brindle. May it please the court. My name is Beau Brindle, and I represent defendant appellant Saul Malero. Mr. Malero and his co-defendant, Mr. Correa, appealed to this court from the district court's ruling on a motion to suppress based on Fourth Amendment violations. And while there are various bases for challenging the district court's ruling, I would like to begin by addressing the Fourth Amendment violation resulting from the seizure and use of key fobs, keys, and garage door openers to identify and ultimately gain access to a residence associated with Mr. Malero and Mr. Correa, in which both maintained reasonable expectations of privacy. In Riley v. California, the Supreme Court ruled that the search of cell phones incident to arrest constituted a Fourth Amendment violation. By that same logic, the seizure of garage door lifters, key fobs, and keys that are used for purposes of searching and identifying a residence would also be a Fourth Amendment violation. I'm puzzled by that line of argument. The Supreme Court has said that arresting officers have a right to learn the suspect's name and address. That's just booking information. If the suspect is not being honest about that, why can't other things, like keys, be used to learn his name and address? Well, in the Riley case, they certainly said that a cell phone couldn't be. Riley is not this case. I wish you would deal with my question. My question starts with the booking information doctrine, that the police have a right to a suspect's name and address, at least, maybe more. And in this instance, when Mr. Correa was questioned, I don't even know what the record says specifically about what his response was. I'm not asking about what Mr. Correa said. I'm asking a legal question. I wish you'd address it. Your Honor, the use of items that are seized to conduct a search, if a search has to be conducted to identify the person's residence, and you have to use instruments that you seize to conduct that search, then that search has to be either within the boundaries of the Fourth Amendment or you need a warrant. To me, the search has to be reasonable. Yeah, it has to be within… Look, that is the basis of my question. If the police are legally entitled to learn the suspect's name and address, why is it not reasonable, if the suspect is dissembling, to use the key for that purpose? The reason it's not reasonable is because the use of the key constitutes a constitutional violation depending on how that key is used. If you're going to take garage door lifters as a homing device to find a residence you have no other basis for finding and go in and use a key to identify which place the person lives at, that's a conducting of a search. Of course it is, Counselor. Which is in violation of the Fourth Amendment. No, conducting a search is not a violation of the Fourth Amendment. Conducting an unreasonable search is a violation of the Fourth Amendment. Indeed. That's why I'm asking you to tell me why, in your view, it is unreasonable to use the key to get information to which the police are legally entitled. I don't think there is any case that ever indicates that the police are entitled to use instrumentalities to conduct searches to identify residents. Mr. Brindley, how about looking in the suspect's wallet or address book? I think if the suspect turns over the wallet and they look at it, they think that's fine. No, they're seized in the arrest. Yes. The Supreme Court talks about those cases in Riley and doesn't seem to have any problem with them. It distinguishes that, and wallets and address books are going to have addresses in them. That's true, and I think one of the differences here is keys do not, on their face, and particularly these keys with which there were multiple keys, do not, on their face, have any indication that they're going to give residents information. Would you agree that the use, the search, of a wallet or address book to locate the suspect's address is reasonable? Yes. Why is this unreasonable? I think because those are normal things that give indicia of residents, and it's not all that intrusive to open the wallet and look for that purpose. What becomes far more intrusive is when we start taking garage door lifters and driving around pushing the button to try to find a building that may or may not be the person's residence. And then we take keys and we find a door that opens, and we start going through mailbox after mailbox after mailbox to try to identify what unit might have some connection to the person, but that we don't know is that person's residence. The keys in the garage door lifters do not, on their face, especially when there's a multitude of keys as there were in this instance, they do not, on their face, provide indicia of residents. And in order to find that, you're going to have to conduct a more intrusive search that goes far beyond the wallet and the identification card. If you're going to start pushing buttons driving around the neighborhood and going in places and putting a bunch of different keys and locks to figure out which mailbox opens, the degree of intrusion is much greater. And I think the issue was basically the same issue in the First Circuit, which is the case we wrote the supplemental authority letter on the Bain case, where they obtained the keys from the individual and then they took those keys and used them to test a door. And in that case they had more information. Here there was a mailbox that had the guy's name on it. And the First Circuit said that turning of that key is a constitutional violation. And the First Circuit directly addressed the government's Concepcion argument that they make here. And they said precisely what Mr. Molero argued in his brief, that Concepcion can't save it for the government in this case. And the reason that Concepcion can't save it for the government in this case is because in Concepcion the difference was they were confirming information that they already had. And the First Circuit said when you have no information about this residence or this property being connected to the person at all, and you're using the keys just for the purpose of conducting a search to get information you had no ability to access or obtain on your own, or had no information about it before, that takes you out of being covered by Concepcion. Now in Bain the reason it worked out was because they stopped and went and got a search warrant, and the search warrant could be reasonably relied upon by the officers. Here that didn't happen. There was no stopping in obtaining a search warrant. They obtained consent from Mr. Correa after confronting him with getting into this residence and finding this residence. And certainly if that was a Fourth Amendment violation it tainted the consent of Mr. Correa, which wouldn't have been obtained had they not presented him with that information. And I think that brings us to the question of the good faith argument that the government brings based on Concepcion. And I think the First Circuit was right about Concepcion and it doesn't help in this circumstance. But I also think if we look at Davis and Justice Sotomayor's concurrence, which was necessary to make Davis the law, that particular concurrence made clear that the key was that the law had to be unambiguous and bright line. And Concepcion is not that. And we know that it's not that by way of the First Circuit's application. If it was so unambiguous, the First Circuit couldn't say in the same circumstances that Concepcion does not apply. So if it's not unambiguous, then Davis cannot provide the good faith antidote that the government looks for. And I think the same is true of Knott's. I think Knott's is equally unhelpful because it's totally different in terms of factual scenario. Knott's is a situation when a tracking device was placed in a known container. So they had a container that they knew about, had information about, and placed a tracking device in. And that's totally different from a situation as here where they have keys that they don't know what they go to. They have no information about. They have garage door openers. They don't know what they open. And without any information, they go around trying to use those things to conduct searches in order to gain access to a residence and may have a connection to Mr. Correa at the time. And ultimately, it turned out as well to Mr. Molero. So also, Knott's does not create an unambiguous bright line that can be applied to this situation. And so good faith is not going to save an unconstitutional search with respect to this issue. With that, Judge, I would like to reserve the remainder of my time for rebuttal, although I would say the following. Judge Easterbrook's question about the doctrine of being able to identify residence information as a right for law enforcement officers was not an argument raised by the government in its brief. And as a result, if the court is interested in supplemental briefing on that particular issue, we would ask to be able to provide that, as that was not something that we had had addressed by the government. Thank you. Thank you, Counsel. Ms. Peluso. Thank you, Your Honor. Good morning, and may it please the court. I'd like to begin by discussing something that counsel just raised with the court, and that is with regard to the information that was actually seized from the vehicle. As Your Honor pointed out, this case is very different than Riley. In Riley, the Supreme Court was analyzing whether a search of a cell phone incident to arrest is a reasonable search without a warrant. The reasoning that the court used in saying no is because of the amount of information that a person in these days now stores in their cell phone. A cell phone is essentially a universe of information, as the Supreme Court pointed out. It contains infinite information about a person's financial records, about their social media contacts, about all sorts of things, that is different than the other effects generally seized from a person at the time of an arrest, like keys. In this case, the evidence that was seized from the vehicle included, as the court is aware, garage door openers, key fobs, and keys. Those were then used by the investigators in the case, but importantly, they were only used in places that are commonly accessible. They used garage door openers to enter into, to open, activate a garage door of a building that was 10 floors, 2 floors of which were occupied by the parking garage. There were multiple people. Does the reasonableness of that search depend upon whether the door that goes up is for a 1 car garage or for a 100 car garage? Not necessarily, Your Honor, because of the amount of information that's gleaned in that search. So the way the district court addressed it was saying that because this was a commonly accessed space of a multi-unit building, it didn't constitute a search at all, because it accessed only space. It was a dragnet. You just went up and down the streets, pushing the button on the doggone door opener until you got lucky. It was a dragnet. You were searching the whole doggone neighborhood. Right? You were searching the whole doggone neighborhood. Not the whole neighborhood. The record reflects that the agent started at 1717 South Michigan Avenue and then went up the alley about a block until 1819 Prairie. So it wasn't the whole neighborhood. It was a targeted search. You would have gone on and done the whole neighborhood if you hadn't gotten lucky in the first, what, block and a half? He conducted a grid search, and he potentially could have continued had none of the doors activated. So the government is taking the position in this case that it's all right to do that. You can walk, drive up and down the street with a garage opener, trying to get everybody's garage door open until you get lucky. That it was reasonable in this case, given the information that the agent had at the time that he was conducting that search. In the same way, it would have been reasonable for him to go to the doorman of all of those buildings and ask, is this the garage door opener that opens the garage attached to this building? Judge Dow pointed out that that was one of many ways that this information could have been gathered by the agent, and that certainly wouldn't have been unreasonable. Oh, there are many ways you could have gotten it. A lot of them are illegal. There were multiple. I mean, the alternate avenue argument rings kind of hollow, doesn't it? I don't think so, Your Honor, because of that factual scenario that Judge Dow pointed out, which is that the garage doors could have been presented to witnesses pretty easily. They could have gone to the front door of these buildings. They could have asked residents. They could have asked the manufacturer of the garages, does this garage door opener match with this garage? If the answer is yes, they take further steps to investigate that residence. As long as there's some conceivable avenue to get the information, it's okay to drive up and down the streets of Chicago and try to open garage doors. That's not the only factor, Your Honor, because also it certainly has to be a reasonable search. You broke the close, didn't you? I'm sorry? You broke the close, to use old trespass language. You open a man's garage door. I think the district court here correctly found that because this was a garage door that is in a commonly accessed space, it is different in some ways than the garage door of a private residence. However, even the garage door of a private residence, the amount of information you get just by seeing if the door opens and closes is so finite. It's similar to the key in the lock. And the rolling numbers situation came on garage doors. They used to arrest kids in the suburbs here for driving up and down the streets and doing exactly what your agents were doing, because they could open quite a few in those days. Exposing people's property and lives to the public. With the intent of gleaning the information contained within the garage. In this case, it was just opening the garage door and shutting it, simply to see, like with the key in the lock. People don't have a right to the privacy of what's in their garage? Certainly. They do have a right to privacy of the contents of the garage, which is a distinguishing feature in this case, and a distinguishing feature in both Concepcion and in Thompson. There is a difference between trying to figure out what is behind the door and figuring out whether the access device works with the lock or the garage door or the automated key fob on the door. That is a completely different analysis. And had they gone further, had they searched the contents of the mailbox? In this case, again, they got no farther than a mailbox. They didn't go like they did in Bain in the First Circuit and open a door, go into a house, do a premises search of the house, gather information, and then use that information. Suppose the officers had the ability to open front doors. We have a lot of front doors that are on electronic locks these days. Suppose the key ring had a fob that opened front doors. Could they have opened the front door? Yes, under this Court's ruling in both Concepcion and in Thompson, so long as the only information they are gleaning is whether the lock works for that particular door. They cannot go in and search the contents of the apartment. They cannot use a super sensitive instrument to get information about the activities within the apartment or within the home. But using a key on a door simply to confirm that that key works on that lock is not a search that requires a warrant. It simply has to be reasonable. Now, Concepcion was long before just Scalia's resurrection, if you want, of the property right concept in Fourth Amendment. How do you square Concepcion with the property right cases? I think that this Court addressed that, at least in part, in Thompson. The issue with the property right in this case, I do think, has to do with whether there was a trespass of private property, which the Court has now said you have to have both a reasonable expectation of privacy but also this property interest is at play in the Fourth Amendment. And here there was no intrusion on any protected property because the agents never left the lobby. Oh, no. Let's talk about that lobby for a minute. The lobby was locked. Yes. Okay. Today people live in urban environments and they don't live on farms, most people, and they don't have a curtilage as you knew it in the common law around the farmhouse. These people, and many of them apparently were owners of the apartments, apparently there was some condo ownership here. That's right. These people had a locked lobby. Why isn't that the curtilage? Because the locked lobby of an apartment building with ten residential floors with multiple units per floor, unnumbered people go in and out of that lobby every day, the postman, guests of the residence. People go in and out if they have the permission of one of the owners, and the owners have agreed among themselves to trust each other but no one else. Well, also renters and their guests. The lobby of an apartment building has a different, if any, reasonable expectation of privacy than outside of the unit door even, which was what was addressed in Thompson. Does the record show in this case whether the defendants here, what their status was? Were they lessors? Is that what they were? They were, yes. They were renters. The lease was in Mr. Malero's name. I see. And he had rented it from whom? Do we know? Yes, there was an owner of the unit who testified at the trial. I see. And for how long was the lease? Do we know? I think it was a one-year lease, and it had potentially been renewed if my memory serves. In writing? Yes. Do we know whether either the lease or the deed to the condominium unit talked about that lobby? I don't believe there's information in the record about the details of the lease's terminology with regard to the lobby. Certainly the record does indicate that the lease was in Mr. Malero's name, but Mr. Correa had access to the unit through the case. Does the record show whether either of these defendants lived in that unit? Yes. The record does indicate that the unit was a one-bedroom unit that did not appear to be lived in. It didn't have personal effects other than a small amount of clothing in the closet and a bed in the one bedroom. The unit appeared to law enforcement agents to be being used essentially as a stash house. Okay. Now, the curtilage concept is usually associated with homes, and we have one case in this circuit from 1979, I believe, in which we have said that a place of business can, in fact, have a curtilage, haven't we? Yes, but this court has also found in cases like Concepcion and Thompson and other cases that the reasonable expectation of privacy in commonly used spaces in places like apartment buildings is not the same as it is in a home. In fact, the court has found there is no reasonable expectation of privacy in the hallways, in the lobby, in the common areas of multi-unit buildings. The First Circuit doesn't agree with us on that, does it? The First Circuit in Bain was dealing with a home. I think it was a two-flat home, which is a different residence certainly than what the court is addressing in this case. So you think numbers might count as opposed to the answer you gave my brother? Well, the issue is whether it's a reasonable expectation of privacy. So I think that that is in some ways very specific. No, it may be a property right. It may be a property right. Can't seven stories of people have a property right? Sure. In common? Yes. And you might have violated it in this case. In this case, what the agents did, I don't think would qualify as a trespass of property, given that the space that they access was only the lobby and then only the mailbox. They didn't go inside the home. They didn't approach the unit. And suppose they've not been police officers. Had they not had. Well, then they wouldn't have been in the lawful possession of the keys. So I think that would put us in a different territory because that would have been a theft. I would assume of the keys in the garage door opener. They found keys on the street. And then legally possessed them, pick them up and then entered the lock spaces. I think that that would probably be different in terms of whether it would be reasonable then for that person to go about using those keys, as opposed to whether it was reasonable for these officers. In this case, I also would like. Tell me if you would, how the good faith exception applies here. Concepcion was certainly different in the mechanisms that we used. Right. And we've narrowed somewhat the good faith exception in the circuit. And one, can you tell me why you think it still applies? Yes. And I think there's two things I'd like to address with regard to that question. The first is the good faith exception was only applied in the event that there was a court's precedent in cases like Concepcion. And for the reasons articulated already, it's not the government's positions that Riley doesn't affect the analysis because the circumstances in Riley were so different. If however, the court finds that Riley does change the landscape in the seventh circuit. Then in this case, using an electronic access device is no different than using a metal access device. It's just a device to glean ownership or to actually just glean, whether a particular device opens or accesses. The officer certainly couldn't point to any case of ours saying that, could they? About an electronic access device? No. Not that specifically, but it is about a key accessing a lock. It's just what mode. How about breaking into the, into the, or using the key to get into the foyer. Could they point to any particular case? I think Concepcion would clearly allow that because Concepcion says that there is no reasonable expectation of privacy in common spaces, which is why judge Dow found that there was no search at all in the accessing of the lobby. So I do think that they could rely on Concepcion for all levels of their investigation here. The Supreme court has a case now under advisement that it's going to deal with this whole question, dragging it in. Is there a good chance that case could affect your use of this garage door open a deal down the street? Your Honor, I'm not familiar with the case that you're referring to. So I would have to look into it, but if the court would like, I'm certainly willing to file a supplemental brief. Well, we're all just surmising now. We don't know what court's going to do. Okay. One final issue that I wanted to raise for the court. I see my time has almost lapsed, but at the end of the day here, Mr. Correa did give consent to search unit 702. And that consent was given not after the agents conducted an unlawful search and not after they'd gone into unit 702 and gathered evidence that they then used to compel a confession or a consent. And it wasn't even consent that was given at the premises. It was consent he gave at the DEA after being Mirandized, having been confronted with only an address, which of course is something they confront every person with when they're asking for consent to search a particular location. But he knew they knew where the stuff was. Well, he knew they knew an address, and that's all the record says that they told him was we'd like you to search this address. And that they could easily get a warrant. The jig was up. I see my time has expired, Your Honor. Just to answer that question briefly, they didn't tell him that they'd searched the unit. They actually asked, is there anything illegal in there? And he said no, and then gave consent to search. But he knew they knew the unit. He knew that they had identified the address. Thank you. Thank you. Thank you, Ms. Peluso. Anything further, Mr. Brindley? Yes, Your Honor, please. Picking up on that last point about the somehow whether Mr. Correa's consent to search could rectify this problem if it is a Fourth Amendment violation, which we believe it is. The answer is no. The agents began with no information whatsoever. He gave them no information that this unit was a place where he was a resident or he lived for part of the time or anything of that sort. So he never gave consent until confronted with now we know you live here, we want to get into this place. He knows what's in there. At that point, his consent is tainted by the Fourth Amendment violation. And to pick up on Judge Ripple's comments about Justice Scalia and the property right, Justice Scalia made clear it's not just the expectation of privacy. I trust it's not just Justice Scalia you're relying on. You're relying on opinions. I believe it was a concurrence. Yes, it was the Jones case, Judge, yes. You're relying on opinions for the court. Yes, Judge. And one of them was a concurrence, which I only identified by Justice Scalia because it's a separate concurrence from some of the others that form the opinion. And in that concurrence, he indicated that what also matters is physical intrusion. And here, the garage door lifters, the reason the garage door lifters could grant Mr. Malero a relief and constitutional violation even under Concepcion is because what the garage door lifters are doing is using electronic means to expose, when the garage door goes up, you expose the entire contents of what's in there. And that's a degree of intrusion that's much greater than many other forms. You get to see whatever is in there, whatever property is in there. And there is no case in this circuit that's ever allowed that you can do that, pushing that button over and over and over again, certainly not after Jones when it makes clear that that kind of physical intrusion is a violation of the Fourth Amendment. And the government talks about Bain and tries to suggest that Bain was a better circumstance because in Bain, they put the key in the door. The problem with that is in Bain, they already knew where the person lived because they saw his name on a mailbox. All they did was confirm it and test the key because they'd gotten in there. And that's different than here where they're going in. First of all, they're going into this area that's locked to them. And people certainly, and they may not have a reasonable expectation of privacy that no one's going to be in there, but they do have a reasonable expectation that the police aren't going to be in there and going mailbox by mailbox to try to find out where they particularly live when they haven't provided that information. And so that's a degree of intrusion that's higher here, which is connected to the logic in Jones and says this is something that can't be allowed. This is a Fourth Amendment violation. And they had no information. The only way they found out where this man lived and had a connection to the residents at all was by way of testing key, key, key, mailbox, mailbox, mailbox, after already being in a place that he didn't give them permission to enter and using a key to get in there. And in the wake of Jones and the physical intrusion and the property right that Judge Ripple's talking about, that's a constitutional violation. With the government, the question was raised whether someone was living there. That was an issue at the trial that an agent said he didn't think so. However, there were clothes in the closet. There was a bed in one of the rooms. It did appear that for some period of time someone was residing there. It was unclear who, which of these people. But we did know that there was a lease in Mr. Malero's name that had been properly signed. It was a legal lease. He was a lessor, and he had the rights that anybody that leases an apartment has. And they have a right not to have people using electronic means to expose their garage and everybody else's garage to observation and view from law enforcement. And in the wake of the Jones case, in the wake of Riley and consistent with what was found by the First Circuit in Bain, this is a constitutional violation. And in light of the fact that, as Judge Ripple points out, there are no cases saying you can use the electronic device and try to open the door going up and down the street. There are no cases that are specifically allowing the conduct here. They can't say there was a bright line rule that said it was okay. Do you need one? What's that? A bright line rule. Well, to try to use good faith, you would have to have some kind of really unambiguous statement. That's what Davis said, and that's what they're relying on. So to try to get good faith, you would need some, yes, absolutely, unambiguous assertion is what the concurrence in Davis requires. And they didn't have that here, and the First Circuit proved that by saying Concepcion would not apply to these facts. And so good faith isn't going to save this. This was a constitutional violation, and it cannot be saved by consent, and it cannot be saved by good faith. And with that, I would ask that the convictions be vacated, and if the court requests further briefing on the issue that Judge Easterbrook brought up, we'd gaily do it if you would request that. Thank you, counsel. The case is taken under advisement.